Bill E. MYERS, Appellant,

v.

Rex KING, Appellee.

No. 16224.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Jan. 31, 1974.

Rehearing Denied Feb. 28, 1974.

William R. Powell, Houston, for appellant.

Black, Hebinck, Hargrove & Clark, James R. Clark, Houston, for appellee.

COLEMAN, Chief Justice.

This is a suit for damages caused by alleged fraudulent conduct. After a trial to a jury, a judgment was entered for the plaintiff. On suggestion of the trial court a remittitur was filed. The defendant, Myers, has appealed from the judgment. The plaintiff, King, complains by cross-point of the action of the court in ordering a remittitur.

In 1964 the defendant was the sole owner of Myers Transportation Company. The plaintiff was employed by a corporation with which Myers did business and was involved with that company's shipping problems. Myers approached King with reference to the formation of a partnership, and an agreement was reached. A written partnership agreement was executed by the parties. Plaintiff paid defendant $55,000.00 for a 30.058% interest in the partnership. Plaintiff found it necessary to borrow $16,000.00 to consummate the deal. The money was secured from the Lockwood National Bank and the defendant indorsed the note plaintiff made at the bank.

The partnership agreement provided that the parties would participate in the profits or losses in proportion to their respective ownerships. It also provided:

". . . The respective shares of the profits shall be credited after the close of each quarter of the fiscal year to the individual drawing accounts established for the partners. All drawings of the partners shall be charged to their respective accounts. Drawings shall be made only as directed by the general partner, in his sole discretion, so as not to impair working capital; and in no event shall more than fifty per cent (50%) of the profits be withdrawn, and the balance thereof credited to increase in capital."

The agreement provided for salaries for the parties; provided that Myers should be the general partner for a period of three years with full authority to make all decisions affecting the partnership, its policy and management with or without the consent of the other partner. The agreement was signed in March, 1964, effective as of Jan. 1, 1964. By letter agreement dated March 6, 1964, Myers agreed that King could purchase additional interests in the partnership until he owned 49%. A formula for determining the price was set out. It was also agreed that at any time prior to January 1, 1966, at the election of Myers,

the partnership could be incorporated by transferring its assets to a corporation formed for the purpose, and by issuing stock in the corporation in proportion to the ownership of the partnership assets.

At the trial of the case Mr. King was asked: "At the time that you bought into the partnership, was there an agreement between you and Mr. Myers concerning any additional compensation, other than your salary?"

An objection was made that the partnership agreement "speaks for itself in all respects as the contract between the parties. The letter offered as an exhibit . . . is unambiguous . . . Any testimony he is making now is outside that agreement and we object to it because there are no pleadings to support it."

The objection was overruled and defendant was given a running objection. The plaintiff then answered, "yes." He was asked what the agreement was and stated: "Any time I had a note due, he would give me a profit, or he would give us a salary bonus to cover the notes that I had to pay to the bank, which he always did." He then testified that he was referring to the note at the Lockwood National Bank by which he had borrowed money to complete his original payment to Bill Myers. He testified that this note in the sum of $16,000.00 was paid in full.

King testified that in the latter part of 1966 he borrowed $41,000.00 from the Lockwood National Bank. Myers helped him negotiate the loan and guaranteed it. It was within a few weeks after the business was incorporated. He received 49% of the shares issued. The $41,000.00 was paid to Myers to bring his interest in the partnership up to 49%. At the time or just prior to receiving this loan from the bank he and Myers agreed "that at any time I had a note due, he would declare a salary bonus, or any time, beings as we just started a new corporation, if we had any financial trouble, he would loan the corporation money, temporarily, you know,

with interest, but we would still maintain the 49–51% agreement." During 1966 when a note payment became due, he received a salary bonus. "If I didn't have cash and savings to make it, I would go to Bill and say, 'Bill, I have got a payment due. I have no savings to make it. It's due this date.' There would always—it would be a check in my desk to cover the loan as a salary bonus and he took likewise."

In 1964 King received total bonus payments in the following amounts: 1964—$3881.02; 1965–$15,296.60; 1966—$19,069.-68. He received from the corporation $4,-110.00 in 1966; $38,960.00 in 1967; and $14,110.00 in 1968. In 1968 Myers formed a warehouse corporation and offered King a 24% interest in it. King increased his loan at the Lockwood National Bank by $20,000.00, and used part of the money to purchase the warehouse corporation stock. This note was guaranteed by Myers.

In the summer of 1968 King testified that his note was becoming delinquent and he talked to Myers about it. He was told: "Don't worry we will start declaring salary bonuses just like we always have." At that time the company had more cash on hand than usual and business was better. During this summer Myers told him: "He was president and he didn't need me no longer. He told me to get out and stay out, yes, sir." He didn't know why.

A special meeting of the Corporate Board of Directors was held August 10, 1968. King testified that the purchase of equipment was discussed, but that there was no mention of issuing stock. With reference to the meeting he also said that he became upset because things had been done in a democratic way before. It was not necessary for Myers to pay for the equipment out of his pocket. The company had money for a down payment and had credit. Myers knew that he didn't have money to buy more stock. He, King, had paid $97,000.00 for 13,000 shares and "now

Bill wanted to get 40,000 shares for $40,000.00." "That wasn't what we agreed." "He had also promised to sign his name anytime the company needed money." "Out of a clear blue sky this all happened and this was done way before the meeting."

Mr. Myers testified that there was "no agreement with reference to the payment of King's bills or guaranteeing money to pay his accounts at the bank out of company funds."

He testified that in 1968 the equipment had been neglected in order to show a profit large enough to justify bonuses to be declared for the benefit of Mr. King. The company usually kept a cash balance between $30,000.00 and $40,000.00. The company had 40 trailers, 17 tractors, 2 bobtails, and 3 company cars. Its principal business was with eleven large corporations, and it was necessary to keep the equipment needed to service those accounts. The monthly overhead expense exclusive of salaries was about $28,000.00. The company was a self-insurer insofar as damage to equipment was concerned and it was necessary to have a cash reserve for repairs and unexpected expense. The monthly bonuses depended on net income and the need for new equipment. Bonuses had been regularly declared and this kept the cash balance low.

During 1968 his accountant advised him to increase the cash position by cutting down bonuses. He was warned that the Internal Revenue Service might determine that the bonuses constituted dividends and assess a tax against the corporation. The longshoremen strike every three years. The business of three customers is adversely affected by these strikes. This affects his business and it was necessary to build a cash reserve to carry the business through this period which was approaching. He had in the past personally guaranteed all corporation loans. This amounted to about $102,000.00 at the time. He determined to discontinue this practice and so informed Mr. King. He asked King if he would co-sign the loans and King refused.

In June, 1968 it was necessary to purchase at least four new trailers to service their Maxwell House Coffee account, mainly shipments of their new freeze dried coffee. Special equipment was required. This purchase could not be financed without his personal guarantee. His lawyers and C.P.A. recommended selling stock for additional capital. He discussed the matter with King who agreed to buy as much as he could although he would not be able to buy his proportionate share. It was agreed that he would have an opportunity to buy at a later date. At the Directors' meeting King voted to issue the stock. King wanted to declare a bonus and apply it on the stock. Myers refused to agree. King tried to sell his warehouse stock, but did not find a buyer. Finally King told him that he did not have the money to buy the stock and that he thought he was being defrauded and intended to file suit. He created a scene and Myers asked him to leave. On November 30, 1968, the Board of Directors removed King as an officer and director of the corporation.

At the conclusion of the testimony the court permitted appellee to file a trial amendment alleging that Myers "falsely and fraudulently and with intent to deceive and defraud Rex King, represented to Rex King that Bill E. Myers, through Myers Transportation Company, would declare salary bonuses sufficient to enable Rex King to pay off his promissory note to the Lockwood National Bank in the amount of $41,695.00, such note being secured by Rex King's forty nine per cent (49%) of the stock in the corporation."

He alleged that such representations were material, false, and known by Bill E. Myers to be false; that Myers knew that the failure to declare the bonuses would result in King's inability to pay the note, resulting in foreclosure on and sale of King's stock; that King believed and relied on such representations and thereby

was induced to sign the promissory note; that Myers intended to defraud King of such funds and his stock in the corporation by causing the corporation to fail or refuse to declare the bonuses necessary to liquidate said note; that as a result of the false representations King was damaged in the sum of $500,000.00, the fair and reasonable cash value of said stock.

In Plaintiff's Second Amended Original Petition, on which he went to trial, he had alleged that after he had reduced the $41,695.00 note to about $20,000.00, "Bill E. Myers requested the plaintiff to go into the warehouse business with him and that there would be sufficient salary and bonus to pay off any additional loan commitments; that Plaintiff obtained additional funds in the form of a loan to enter the warehouse business . . .; that after enticing the Plaintiff to borrow this additional money for the warehouse business, the Defendant refused to pay a bonus, when funds were available."

There were no other allegations of representations on the part of Myers to induce King to borrow money. Appellant contends that the action of the trial court in permitting the filing of the trial amendment was an abuse of discretion, pointing out that he had objected to the evidence of alleged misrepresentations of fact on the basis of lack of pleadings.

■ The circumstances under which permission to file the trial amendment was granted do not appear in the statement of facts or by Bill of Exception. Rule 66, Texas Rules of Civil Procedure, directs the court to freely allow a trial amendment when the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his defense on the merits, and where the presentation of the merits of the action will be subserved thereby. There is no showing that appellant requested and was denied a delay necessary to prepare to meet the new cause of action. The court did not err in permitting the trial amend-

ment. Missouri-Kansas-Texas Railroad Company v. Gage, 438 S.W.2d 879 (Tex. Civ.App.-Ft. Worth 1969, writ ref. n. r. e.); Rose v. Shearrer, 431 S.W.2d 939 (Tex.Civ.App.-San Antonio 1968).

■ Because of the parol evidence rule plaintiff's testimony that prior to the execution of the partnership agreement Myers had agreed to declare bonuses sufficient to make the payments on his $16,000.00 note at the Lockwood National Bank would have been immaterial and inadmissible had this been an action to enforce the agreement. It directly contradicted certain provisions of the written partnership agreement. The parol evidence rule is not a rule of evidence, but a rule of substantive law. Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30 (1958). Since an inconsistent prior oral agreement cannot be enforced, evidence tending to establish such an agreement would be immaterial. Here plaintiff is not seeking to enforce the prior oral agreement. His testimony that there was such an agreement and that defendant performed his obligations under that agreement was relevant and material evidence to support his allegation that he reasonably relied on defendant's subsequent promise to cause the corporation to declare bonuses when payments became due on plaintiff's $41,000.00 note. The trial court did not err in admitting this testimony.

Even had the evidence been erroneously admitted, we could not say that it probably caused the rendition of an improper judgment. It is doubtful whether a jury would be more willing to believe appellee's testimony that there were two agreements relating to bonuses rather than one only. The testimony that appellant had fully performed the first agreement, when considered in context with the fact that appellant had agreed to the issuance to appellee of 49% of the stock in the corporation prior to the time the $41,000.00 loan, from which appellant was paid for the additional partnership interest, was negotiated, would be evidence that at the time the second agreement was made appellant intended to per-

form his obligations under that agreement, and that he was not guilty of any fraudulent conduct inducing appellee to pledge his stock as security for the loan.

The jury found that appellant represented that the corporation would declare salary bonuses sufficient to enable appellee to pay off the $41,000.00 promissory note; that the representation was false; that defendant knew it was false; and that the representation was fact rather than opinion. Appellant has attacked all of these findings by "no evidence" points. These points do not present error. Appellee testified that appellant agreed that any time appellee had a payment due on the note "he would declare a salary bonus." Appellant testified that he made no such promise. Appellant refused to declare a salary bonus after appellee notified him that a payment was due on the note and that he had no funds with which to pay it. As a result appellee was unable to pay the note and the lien on his stock was foreclosed. Appellant knew at the time the loan was made that appellee would be unable to pay it out of his salary and that he had no other source of income sufficient to make the payments.

In Turner v. Briscoe, 141 Tex. 197, 171 S.W.2d 118 (1943), the court said:

"The governing principles of law are familiar. A person's intention is a matter of fact. When a promise is made the promisor expressly or by necessary implication states that he then has a present intention to perform, and if such intention does not actually exist at that time, a false statement of fact has been made upon which fraud may be predicated. The gist of the fraud is deception as to an existing fact, namely, the state of the promisor's mind. That fact may be established by circumstantial evidence taken in connection with the breach, but cannot be established by the breach alone. The fact of breach, standing alone, does not even raise the issue of

lack of intention to perform at the time the covenant was entered into."

In Stone v. Williams, 358 S.W.2d 151 (Tex.Civ.App.-Houston 1962, writ ref. n. r. e.), this court said:

"Where, as here, the representation is a promise to do something in the future and there exists at the time of the representation an intention not to perform, there is the representation of an existing fact. While a mere failure to perform is not sufficient to prove the existence of an intention not to perform at the time the promise is made, where the party allegedly making the promise denies making the promise, there is sufficient evidence to support a finding that there was the absence of intention to perform when it was made."

See also, Stanfield v. O'Boyle, 462 S.W.2d 270 (Tex.1971).

The appellant has presented no points of error attacking the issues on damages or the answers made by the jury to those issues. Appellee, however, complains of the action of the trial court in requiring a remittitur.

Special Issue Number 7 asked the fair and reasonable cash value of the stock in question as of July 7, 1966. The jury found the value to be $107,800.00. Special Issue 8B asked the amount of money to be awarded as exemplary damages. The jury found the sum to be $42,200.00. Judgment for the plaintiff was entered on the jury verdict. On consideration of the motion for new trial the court ordered a remittitur in the sum of $132,372.74.

In Bendalin v. Delgado, 406 S.W.2d 897 (Tex.1966), and the cases cited therein, various factors which may be considered in determining the value of stock in closely held corporations are suggested. Appellee paid $96,980.00 for the stock. The partnership paid bonuses during the years 1965 and 1966 in a sum approximat-

ing $70,000.00. During the year 1967 the corporation paid salaries and bonuses in the approximate sum of $76,000.00 to the two stockholders. There was evidence from which an approximate value of the corporate assets could be determined. The value placed on the stock by the jury was not clearly excessive. State v. Schlick, 142 Tex. 410, 179 S.W.2d 246, 249 (1944).

 In Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835 (1959), the Supreme Court set out the test to be used by this court in considering a cross-point complaining of the action of the trial court in ordering a remittitur. The test is not whether the evidence is sufficient to support the verdict of the jury. Rather we must determine whether the trial court abused its discretion in making the order. It was the duty of the trial court to determine the amount that would reasonably compensate appellee for the damage sustained, and to treat the balance of the jury's verdict as excess. The trial court was authorized by Rule 328, T.R.C.P., to require a remittitur of such excess. This rule applies to awards for exemplary damages as well as to awards for compensatory damages. Brosofske v. Gregory, 463 S.W.2d 48 (Tex.Civ.App.-Houston [14th Dist.] 1971).

In Flanigan v. Carswell, supra, the Supreme Court said:

"... If, in the light of all the facts and circumstances, the trial court's order of remittitur was manifestly unjust, the Court of Civil Appeals should restore the remittitur or such part thereof as the Court of Civil Appeals deems necessary to prevent the order from being manifestly unjust and render such judgment as the trial court should have rendered."

After applying this standard we conclude that the trial court erred in ordering a remittitur in the sum of $132,372.74 and interest in the sum of $1,436.16. This court concludes that a remittitur in the sum of $83,200.00 is required. Accordingly the judgment is reversed and judgment is here rendered that Rex King recover of and from the defendant, Bill E. Myers, the sum of $66,800.00 together with interest on that amount at the rate of six per cent (6%) per annum from the 12th day of March, 1973, until the judgment is paid. All costs are taxed against the defendant, Bill E. Myers.

Reversed and rendered.